IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY ALMENDAREZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:14-CV-244-O |
| | § | |
| WILLIAM STEPHENS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Michael Anthony Almendarez, a state prisoner confined in the Correctional Institutions

Division of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director

of TDCJ, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has

concluded that the petition should be denied.

## I.  BACKGROUND

In 2008 Petitioner was indicted in Wise County, Texas, with one count of indecency with a

child and one count of sexual assault of a child. Adm. R., WR-25,888-02 Writ, vol. 1, 101, ECF No.

13-5. The indictment also included a repeat-offender notice. *Id.* The state appellate court summarized

the factual and procedural background of the case as follows:

> While on parole for an unrelated conviction, thirty-four-year-old Almendarez
> moved in with his mother (Charlotte), his stepfather, and S.B., his sixteen-year-old
> stepsister. According to S.B., he started regularly supplying her with mixed drinks
> containing Everclear alcohol and getting her drunk when her father and stepmother
> were at work, asleep, or otherwise not around. According to S.B.'s then-fifteen-year-
> old best friend Shelby Crowley, Almendarez called Crowley and told her that he had
> gotten S.B. drunk one weekend and, while giving S.B. a foot massage, "one thing led

to another" and, over S.B.'s clothes, he touched the inside of S.B.'s thighs and rubbed on her genital area.

On May 3, 2008, after Almendarez supplied some Everclear-based mixed drinks to S.B., S.B. became intoxicated. Almendarez helped S.B. to bed and left her room. S.B. awoke later to find Almendarez next to her in bed, her hand on his erect penis. S.B. passed out and awoke a second time to find that she was naked and that Almendarez had his tongue on her female sexual organ. S.B. passed out again. When she awoke a third time, she found Almendarez on top of her, with his penis inside her female sexual organ. S.B. told him to stop, pushed him off, passed out again, and when she awoke, she told Almendarez to leave her room.

The following day, Almendarez wrote S.B. an apology letter that described the assault in detail and asked for S.B.'s forgiveness. S.B. tore up the letter and threw the pieces in the trash can in her bedroom. Almendarez wrote S.B. two more letters and a poem. S.B. left the second letter and poem on her bed, but she tore up the third letter and also put it in the trash can in her bedroom.

Later that week, S.B. told Crowley about the assault. After school, Crowley and S.B.'s friend Kelsey Knighten confronted Almendarez at work, and he admitted to them that he had sex with S.B. on May 3, when they were drunk. The next evening, Crowley told her stepfather about the assault. Crowley, her mother, and her stepfather went to S.B.'s family's trailer to provide support for S.B. when she told her father and Charlotte about the assault. S.B. went outside to meet them, and when her father and Charlotte joined them, S.B. told them about the assault. Almendarez stayed inside.

Crowley's mother called 911, and two sheriff's deputies responded to the call. One deputy entered the trailer to speak with Almendarez, and the other remained outside with S.B., S.B.'s parents, Crowley, and Crowley's parents. At some point, Charlotte entered the trailer and asked Almendarez about whether he had given S.B. alcohol, and he admitted to her that they drank alcohol together on the night of the assault.

S.B. told the deputy that Almendarez had written her some letters and that they were in her bedroom. Because neither S.B. nor her father wanted to go into the trailer, Crowley offered to retrieve the letters, and S.B. told her where to find them. Crowley entered the trailer, went into S.B.'s bedroom, and retrieved them. Crowley returned outside, taped the torn letters back together, and gave all of the documents to the deputy. Prior to trial, Almendarez filed several motions to suppress these documents, which the trial court denied, and he reurged his motion during trial, which the trial court again denied.

2

The first letter stated:

There's nothing that I can ever say to fix my stupidity. I think that it started when you kissed me back and then started jacking me off as I rubbed you down there. Part of me knew better, but being drunk and feeling you respond back, made me think that it was ok to lick you down there. As I did . . ., and you moving with my . . . tongue and your "xxx" . . . my mind went somewhere. . . .

I should have just left then. I kept screwing up because the alcohol was kicking in stronger and stronger. I stuck it in a little & you said it hurt, and that was the only time I was inside you. Maybe 2 seconds. I remember rubbing against you, but I wasn't inside.

All of this is in case you're stressing over being pregnant. You're not.

Please forgive me [S.B.]. I've never wanted to mess up our friendship. Lots of people have gotten drunk & done things they regretted. Please understand it was alcohol. I love you. I don't regret part of it, because you are attractive. I regret that you're uncomfortable and stressed, and scared. I'm pouring out the alcohol today, and I'll never drink in your house again or be drunk around you. I love you enough to do my best to make it right for the future. I will leave if you want that. I won't be mad. I really am sorry. Just please give me another chance to be normal with you. It hurts to think that I am shut out of your life, but I can accept your decision.

I wish you the best in life and you'll always be in my heart.

I'm sorry.

The second letter stated:

When I was on my knees holding your hands, the way that you left made me realize that I needed to give you your space and get another job.[2]

[2]S.B and Almendarez worked together at a barbecue restaurant.

Your feelings matter to me. I would prefer your happiness over mine. When I'm at work, I get pleasure from talking smack to everyone that's entertaing [sic] it, because they laugh. I receive pleasure from giving other people pleasure. So I put on my game face lately, even though I'm uncomfortable knowing that you don't want

me around you.

To be perfectly honest as I can with you, you have some of the best *qualities* in anyone that I've ever met. But I've brought you unhappiness. If I thought that by dropping Stephanie and trying to feel your pain, and even trying to date you, would somehow make it right; so that you wouldn't assume that I would "hit something & then quit something . . ." I would.

If I thought that there were someway [sic] to regain your trust, I would.

If I thought that by leaving a job that I need, to give you your space, would make you happier, I would.

If I thought that by moving I could bring you more happiness, I would.

I love you and would do my best to prove it to you.

I have historically screwed things up. I've never tried to make things right, but this time I want to because I'm motivated by love.

I don't expect you to believe me or to even finish reading this.

You are very special to me and because of this, I put your happiness first. You have been my joy for so long. You've made me feel at peace. You're so wonderful in so many ways. And I've ruined our relationship.

I'll stay out of your way, and your space, for your happiness, and hopefully, someday, you'll see that I really did care.

The only other option is for me to do something before you hate me worse.

Take Care

In the poem, entitled, "An Angel," Almendarez blamed himself for making an angel upset; in the last letter, he asked S.B. to pray with him.

Almendarez was arrested that night on an administrative warrant for a parole violation. S.B. went home with the Crowleys, and the next morning, Crowley's mother took S.B. to a hospital, where she underwent a sexual assault examination. Because of the length of time that had elapsed between the assault and the examination, no physical evidence was taken from S.B.

After further investigation, the State charged Almendarez with one count of

4

indecency by contact–causing S.B. to touch his genitals–and one count of sexual assault of a child–causing S.B.'s sexual organ to contact his sexual organ.

Almendarez denied that he had provided alcohol to S.B. but admitted that they had been drinking alcohol together on the night of the assault. He said that they had been watching comedies on the internet when S.B. spilled her drink on the computer keyboard. S.B. started throwing up on the rug near the computer while Almendarez cleaned up the spill. He denied sexually assaulting S.B. or that they had had any sexual relationship. Almendarez said that they had a conversation the next day on the way to work about how upset he was about S.B. spilling her drink and throwing up on the rug. He told S.B. that he was going to tell their parents about it, and this made S.B. mad.

Almendarez also denied telling Crowley that he and S.B. had sex on May 3 or that he had ever called Crowley to tell her that he had gotten drunk and touched S.B. He said that Crowley demanded that he write the first letter, told him what to write, and threatened that she and S.B. would have his parole revoked if he did not. He admitted that he wrote the other two letters and the poem on his own but said that he was motivated to make a false confession by fear. Both S.B. and Crowley denied any involvement in Almendarez's letter-writing efforts. Charlotte testified that S.B.'s reputation for being truthful was bad.

After both parties rested, Almendarez asked for an article 38.23 instruction related to the legality of Crowley's acquisition of the letters from S.B.'s room. Almendarez also asserted that because both counts arose from the same incident, the application paragraph should require the jury to select from either the indecency or the sexual assault charge. The trial court denied these requests.

A jury found Almendarez guilty of both counts, and after Almendarez pleaded true to the enhancement paragraphs and the jury heard punishment evidence, the jury sentenced him to twenty-five years' confinement on each count.

*Id.*, Mem. Op. 2-7, ECF No. 12-9.

The appellate court affirmed the judgment on the jury's verdict, the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review, and the Supreme Court denied writ of certiorari. *Id.,* "Docket Sheet" 1-2, ECF No. 10-2. Petitioner also filed a state habeas application challenging his convictions, which was denied by the Texas Court of Criminal Appeals without written order. *Id.*, WR-25,888–02 Writ, vol. 2, 136-49, ECF No. 13-2. This petition for federal

habeas relief followed.

## II. ISSUES

In four grounds, Petitioner raises the following claims:

(1)  He "is actually innocent pursuant to a *Schlup*-type claim of actual innocence, in breach of Due Process under the Fourteenth Amendment";

(2)  "Unconstitutionally obtained evidence, bearing on [his] innocence, was admitted against [him] in breach of the Fourth and Fourteenth Amendments";

(3)  He was denied his "right to present a complete defense under the Sixth and Fourteenth Amendments, and Confrontation Clause–as elucidated in *Davis v. Alaska,* 415 U.S. 308"; and

(4)  He was "denied a full and fair adjudication on the merits of his first appeal as of right, in breach of the Sixth Amendment and Due Process and Equal Protection Clauses of the Fourteenth Amendment."

Pet. 6-7, ECF No. 1.

## III. RULE 5 STATEMENT

Respondent asserts that the petition is not barred by the statute of limitations or successiveness and believes that Petitioner has exhausted state court remedies as to the claims as construed. Resp't's Ans. 9, ECF No. 15.

## IV. DISCUSSION

### A.  Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the

state court. *Id.* § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The presumption of correctness applies to both express and implied factual findings. *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001). Absent express findings, a federal court may imply fact findings consistent with the state court's disposition. *Townsend v. Sain,* 372 U.S. 293, 314 (1963); *Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir. 2003); *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002).

Finally, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law" in making its decision. *Johnson v. Williams,* — U.S. —, 133 S. Ct. 1088, 1094 (2013); *Harrington,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2004).

**B.  Actual Innocence**

Under his first ground, Petitioner claims that he is "actually innocent pursuant to a *Schlup*-type claim of actual innocence, in breach of Due Process under the Fourteenth Amendment." Pet. 6, ECF No. 1. In support of his claim, he asserts that, after trial, two jurors, Kouri and Burk, informed his trial attorney that they, and other jurors, did not find the state's witnesses to be credible

and, instead, based their decision largely on Petitioner's own "writings." Pet. 6, ECF No. 1. Petitioner asserts that the jurors' statements amount "to newly discovered impeachment of the prosecutorial witnesses" and contradicts the state appellate court's rationale for affirming his convictions on direct appeal. Pet'r's Mem. 1, ECF No. 1.

Actual innocence is not an independent ground for habeas relief. *See Lucas v. Johnson,* 132 F.3d 1069, 1074 (5th Cir. 1998) ("Claims of actual innocence . . . have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.") (quoting *Herrera v. Collins,* 506 U.S. 390, 400 (1993)). Actual innocence may be asserted in a federal habeas petition as a gateway to obtain review of constitutional claims that are procedurally barred, as a function of the fundamental miscarriage of justice exception, but it may not be asserted as an independent ground for habeas relief. *See Schlup v. Delo,* 513 U.S. 298, 314-17 (1995). Petitioner has not asserted that any of his claims are procedurally defaulted; therefore his actual innocence claim cannot be used as a gateway pursuant to *Schlup.*

## C. Fourth Amendment Claim

Under his second ground, Petitioner claims the letters taken from S.B.'s bedroom without a search warrant were illegally obtained in violation of the Fourth Amendment and should have been excluded. Pet. 6, ECF No. 1. Respondent asserts this claim is not cognizable on federal habeas review because Petitioner had the opportunity to raise the issue at trial, on direct appeal, and in his state habeas application. Resp't's Answer 13, ECF No. 15.

The record supports Respondent's assertion. Petitioner raised the claim in a pretrial motion to suppress, during trial, and in his appellate brief. In overruling the issue on appeal, the state

appellate court provided:

> In his third issue, Almendarez asserts that the trial court erred by failing to suppress the letters and poem that he wrote to S.B. because Crowley's entry into his family's trailer violated his right to privacy under the United States and Texas Constitutions and that the letters were thus inadmissible or, alternatively, that the trial court erred by failing to include an article 38.23 instruction in the jury charge with respect to the letters. In response, the State contends that Almendarez lacks standing to challenge Crowley's actions because he did not have a reasonable expectation of privacy in S.B.'s bedroom.

> To assert a challenge to a search and seizure under the United States and Texas Constitutions and article 38.23, a party must first establish standing. Standing may be reviewed as part of the claim presented or may be raised by the court of appeals sua sponte. Standing is a question of law that we renew de novo.

> To establish standing, the defendant has the burden of providing facts to establish a legitimate expectation of privacy, and to carry this burden, he must prove that (1) by his conduct, he exhibited an actual subjective expectation of privacy and (2) circumstances existed under which society was prepared to recognize his subjective expectation as objectively reasonable. The following factors are relevant in determining whether the defendant's subjective expectation is one that society is prepared to recognize as objectively reasonable: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy. Courts must also examine the totality of the circumstances surrounding the search.

> Almendarez bore the burden of proof to show that he had a legitimate privacy interest in S.B.'s bedroom. There is no evidence in the record showing that Almendarez had a subjective expectation of privacy in S.B.'s room or the documents. Rather, the record reflects that Almendarez gave the letters and the poem to S.B., thus surrendering any right that he had to assert a property interest in them. Further, there is no evidence to show that Almendarez had a subjective expectation of privacy over the areas primarily occupied and controlled by S.B. Accordingly, he lacked standing to complain of Crowley's actions, and the trial court did not err by denying his motion to suppress.

Adm. R., WR-25,888-02 Writ, vol. 1, 45-64, 115-18, ECF No. 13-5 & vol. 2, 143, ECF No. 13-2

(citations omitted).

The record further reveals that Petitioner raised the issue in his petition for discretionary review and his state habeas application, to no avail.  On this record, it is clear that Petitioner had an opportunity for full and fair litigation of his Fourth Amendment claim.  Thus, the Supreme Court's *Stone v. Powell* decision precludes federal habeas review of the claim.

### D.  Right to Present a Defense

Under his third ground, Petitioner claims his right to present a defense and confront witnesses against him under the Sixth Amendment were violated by the trial court's exclusion of his proffered testimony regarding S.B.'s prior sexual activity and claims of physical abuse by others. Pet. 7, ECF No. 1. The state appellate court addressed this claim as follows:

### IV.  Harmless Error

Almendarez argues that he was denied the right to present a full defense because the trial court excluded evidence of S.B.'s specific prior bad acts and her prior allegations of physical abuse against others and that the trial court erred by admitting evidence of his extraneous offenses without a limiting instruction.

### A.  Excluded Testimony

S.B., Charlotte, and Almendarez all testified outside of the jury's presence as set out below.

S.B. admitted to most of the misdeeds alleged by Almendarez, namely drinking alcohol, smoking cigarettes, driving her father's truck without permission or a driver's license, dating an eighteen-year-old boy and going to his house when she was not supposed to, and being late for work due to spending time with her boyfriend, but she denied smoking marijuana. S.B. admitted that she and Almendarez had a conversation about these acts around May 4, 2008, but she denied that she was upset with Almendarez for telling her that he was going to tell her parents about them.

S.B. also denied that her allegations against Charlotte for physical abuse in 2003, 2005, and 2006 were false and said that she did not make the allegations

10

because she was mad at Charlotte. She admitted that she signed an affidavit of nonprosecution so that she could return to live with her father and Charlotte, but on cross-examination by the State, she explained that the affidavit just stated that she did not want to go forward with the charges and that she did not make any statements in the affidavit about lying about the allegations or that they were false.

S.B. denied making an allegation of abuse against her biological mother so that she could return to live with her father and Charlotte. S.B. also denied that she had been in a fight with a boy at church in 2004 and had assaulted him. In response to defense counsel's question about whether she would agree that the allegation that the boy had assaulted her was false, S.B. replied, "Yes. Well, no; it's not false."

Charlotte testified that in 2003, S.B. falsely accused her of physical abuse when S.B. was upset with her, and Child Protective Services (CPS) became involved. She said that CPS's investigation did not result in any charges against her. Charlotte also said that in 2005, she and S.B. had had an argument the day before she took S.B. to the airport for a visit to her biological mother, and she learned later from S.B.'s biological mother that S.B. had again made false allegations of physical abuse against Charlotte. CPS investigated again, but no charges were brought against Charlotte. Charlotte also said that in 2004, S.B. told her that a boy had assaulted her at church; after Charlotte called the police and investigated, she learned that the allegation was false.

Charlotte said that on the night Almendarez was arrested, she asked S.B. if she had been going over to her boyfriend's house instead of going straight to work after school and that S.B. first lied but then admitted that she had been doing this. S.B. also initially denied other activities such as drinking, smoking, and taking the truck when she was not supposed to; Charlotte said she did not recall if S.B. later admitted to drinking, smoking, or taking the truck. Charlotte said that S.B. had a bad reputation for truthfulness.[3]

> [3]Charlotte also stated before the jury that S.B.'s reputation for being truthful was bad.

Almendarez testified that he had seen S.B. drink alcohol over thirty times, that he had seen her smoke cigarettes at least ninety times, and that he had seen her on several occasions take the truck on her own when she was not supposed to. He also said that S.B. told him about her eighteen-year-old boyfriend and that he had seen the boyfriend drop S.B. off at work late. When he called home to look for her once when she was late for work and later told her about this, S.B. got mad, threatened him, and told him to never call anywhere looking for her.

On the day after the alleged sexual assault, Almendarez testified that when

he and S.B. drove to work, he told her that everything would have to stop: the boyfriend, the cigarettes, going to the boyfriend's house, the drinking, and the truck stealing, or he was going to report the boyfriend to the police because of his age, and tell their parents. Almendarez said that he told S.B. this because when they had been drinking together on May 3, S.B. spilled some alcohol on an expensive computer, and the risk of him getting in trouble was too high. Almendarez said that S.B. then threatened that if he said anything to their parents, she was going to put him in jail first.

Almendarez also stated that he was aware of S.B.'s abuse allegations to CPS prior to May 2008 and knew that S.B. was capable and had a history of putting people in compromised legal situations. S.B. had told him that she wanted to get back to her father and Charlotte's trailer for Christmas because they had more money than her biological mother, and she wanted better Christmas gifts, so she had made false allegations against her biological mother to get back home.

The trial court sustained the State's objection to the testimony above and to Almendarez's request to admit CPS records ruling out S.B.'s physical abuse accusations against Charlotte.

## B. Limiting Instruction on Extraneous Acts

Almendarez requested a limiting instruction on his extraneous acts: Crowley's testimony about Almendarez telling her that he had touched S.B.'s thigh and genital area over S.B.'s clothes while S.B. was drunk on a prior occasion and S.B.'s testimony that he had performed oral sex on her on the night of the assault, as well as the letters' references to same.

## C. Harm

We assume, without deciding, that the trial court erred by excluding S.B.'s specific bad acts and by failing to give a limiting instruction on Almendarez's extraneous offenses.

## 1. Constitutional Error

In his second issue, Almendarez states that the trial court abused its discretion by excluding his evidence because the specific bad acts were to show S.B.'s motive for making false accusations against him. Likewise, he contends that Charlotte's testimony about S.B.'s false allegations of abuse were also admissible to show S.B.'s motive in making the accusations against him.

Both Almendarez and the State agree that a Confrontation Clause issue is not

presented, although the State contends that the evidence would also have been excluded under the Sixth Amendment because there was no causal connection or logical relevance that could give rise to a potential bias or motive to testify and Almendarez, while limiting his analysis to the rules of evidence, argues that if this court disagrees that the evidence is admissible under the rules of evidence, it is "nevertheless admissible under the Confrontation Clause." Because the Confrontation Clause is implicated in this analysis, we will review the assumed error under rule 44.2(a). *See Rubio v. State,* 241 S.W.3d 1, 3 (Tex. Crim. App. 2007) (stating that any Confrontation Clause violation is subject to harmless error analysis).

In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction or punishment. Tex. R. App. P. 44.2(a); *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999). Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied,* 532 U.S. 944 (2001). We consider a nonexclusive list of factors, including the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden v. State,* No. PD–1524–10, 2011 WL 4467280, at *4 (Tex. Crim. App. Sept. 28, 2011) ("At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment .'").

The trial court excluded S.B.'s and Almendarez's testimonies about S.B.'s misdeeds (drinking, smoking, driving without permission, dating an older boy, and being late for work because of her relationship with the older boy) and about S.B.'s reaction to Almendarez's threat to tell Charlotte and her father about these misdeeds–S.B. said that she was not upset, and Almendarez said that she was and that she threatened him. However, the jury heard Almendarez testify that when he told S.B. that he was going to tell their parents about her spilling her alcoholic drink on the computer and then vomiting on the rug, S.B. and Crowley threatened that they would have his parole revoked if he did not write the first letter and that his motivation to make a false confession by writing the first letter and then the subsequent two letters and the poem was fear of S.B. and Crowley.[5] Therefore, the jury still had a chance to judge S.B.'s credibility in light of her alleged threat to have Almendarez's parole revoked and, inferentially–based on the letters' content–that her threat involved the charged offenses.

[5]Almendez told the trial court outside the jury's presence that

if State's Exhibits 1, 2, and 3–his letters and the poem–had been suppressed, then he would not have testified.

Further, although the trial court excluded S.B.'s, Almendarez's, and Charlotte's testimonies about S.B.'s physical abuse allegations against Charlotte made several years before, along with the records covering the family's extensive CPS history, the jury heard Charlotte testify that S.B. had bad character for truthfulness.

In its opening statement, the State focused on Almendarez's letters. Immediately following the State's opening statement, Almendarez informed the jury in his opening statement that the jury needed to pay close attention to S.B.'s testimony, to listen "to what her motivation may be to tell something that's less than the truth,"[6] and to listen for consistency in what S.B. had told various people. He also attempted to mitigate the letters' impact, stating that the jury should determine whether "it's possible that a person could write these notes and write these letters for some motivation other than the fact that they're true."

> [6]Almendarez's counsel also stated,
>
> And what you're going to hear is that right around this time, right around May 9th of 2008, when she made this allegation, just before that, you're going to hear that there was some sort of a confrontation between [S.B.] and . . . Almendarez, that would cause [S.B.]–would give her motivation to accuse him of something like this.

In the first part of its closing argument, the State argued that the jurors should think about the evidence that they heard and look at the letters. Almendarez then argued that there were inconsistencies in the witnesses' testimonies, that S.B. was a liar, and that Almendarez had told the jury "that something was going on, and that he felt threatened by these girls." He further argued that Crowley had dictated the contents of the letter to him and that Charlotte had testified that S.B. was not a truthful person. The State then closed by reemphasizing Almendarez's letters, how absurd Almendarez's blackmail theory was as S.B. had torn up and thrown away two of the letters, and that the letters contained the truth.

Because the letters written by Almendarez contained explicit, graphic descriptions of the charged offenses and were admitted into evidence, and because the defense theory that S.B. was a liar with a motivation to lie and to blackmail Almendarez into writing the letters was before the jury, after carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's alleged error did not contribute to

14

Almendarez's conviction or punishment. Tex. R. App. P. 44.2(a). We overrule
Almendarez's second issue.

Adm. R., Mem. Op. 10-18, ECF No. 12-9 (footnote 4 omitted).

Petitioner fails to show that the state court "unreasonably" applied federal law in holding that

the exclusion of the proffered testimony did not contribute to Petitioner's conviction or punishment.

The Sixth Amendment "guarantees criminal defendants a meaningful opportunity to present a

complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006) (internal quotation marks

omitted). However, Petitioner was not completely precluded from presenting his theories to the jury,

and the jury had the opportunity to evaluate S.B.'s credibility when she testified. Under these

circumstances, it cannot be said that the absence of the additional testimony had a substantial and

injurious effect on the verdict. *Fry v. Pliler,* 551 U.S. 112, 121-22 (2007).

### E. First Appeal as of Right

Finally, under his fourth ground, Petitioner claims he was denied a full and fair adjudication

in his first appeal as of right because the state appellate court decided his Fourth Amendment claim

differently than it did in an identical case four years earlier, in violation of his right to equal

protection. Pet'r Mem. 6, ECF No. 1. Petitioner cites the Court to *Matthews v. State,* 165 S.W.3d

104, 110 (Tex. App.–Fort Worth 2005, no pet.), wherein the appellate court held that because the

state failed to argue against standing at pretrial, it was judicially estopped from raising the issue on

appeal. According to Petitioner, as an identically-situated litigant, the appellate court should have

determined that the state forfeited review of its standing argument by raising it for the first time on

appeal.

Petitioner's case is distinguishable from *Matthews.* In Petitioner's case there was no pretrial

15

hearing on his motion to suppress, at which the state relied on an inconsistent legal position. Accordingly, his claim fails to implicate an equal-protection violation.

## V.  CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**.  Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 19th day of January, 2016.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**